# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 07-1914

_____

United States of America,                    *
                                             *
    Plaintiff - Appellee,            *
                                             *
v.                                           *
                                             *
Colin Spotted Elk,                           *
                                             *
    Defendant - Appellant.           *


_____

No. 07-1923

_____

      Appeals from the United States
      District Court for the District
      of South Dakota.

United States of America,                    *
                                             *
    Plaintiff - Appellee,            *
                                             *
v.                                           *
                                             *
Flint Thomas Red Feather,                    *
                                             *
    Defendant - Appellant.           *

_____

No. 07-1925
_____

United States of America,                    *
                                              *
    Plaintiff - Appellee,                 *
                                              *
    v.                                    *
                                              *
Rusty Richards,                               *
                                              *
    Defendant - Appellant.                *


_____

No. 07-1931
_____

United States of America,                    *
                                              *
    Plaintiff - Appellee,                 *
                                              *
    v.                                    *
                                              *
Marvella Richards,                            *
                                              *
    Defendant - Appellant.                *

_____

No. 07-1937
_____

United States of America,          *
                                          *

     Plaintiff - Appellee,      *
                                          *

     v.                           *
                                          *

Geraldine Blue Bird,          *
                                          *

     Defendant - Appellant.   *

_____

Submitted: February 11, 2008
Filed: November 26, 2008
_____

Before WOLLMAN, JOHN R. GIBSON, and SHEPHERD, Circuit Judges,
_____

JOHN R. GIBSON, Circuit Judge.

This is the appeal of five defendants convicted of multiple drug and gun crimes in connection with their operation of a drug trafficking business on the Pine Ridge Oglala Sioux Reservation in South Dakota.

Geraldine Blue Bird argues that the district court erred in failing to suppress evidence discovered as a result of Fourth Amendment violations; in allowing the government to strike one venire-member and in excusing another venire-member for cause; in entering a judgment of conviction for gun and drug offenses without sufficient evidence; in allowing hearsay statements and opinion testimony; in

-3-

admitting evidence seized pursuant to a warrant that the government did not produce in discovery; and in determining an appropriate sentence.

Colin Spotted Elk argues that his Sixth Amendment confrontation rights were violated when the district court admitted testimony that Blue Bird had implicated him in a scheme to cover up the conspiracy. Spotted Elk also contends that his conviction on Count VI must be reversed because the jury was wrongly instructed that taking a gun in exchange for drugs would satisfy the "use" element of 18 U.S.C. § 924(c); the government confesses error on this point in light of Watson v. United States, 128 S. Ct. 579 (2007), which was decided while this appeal was pending.

Marvella Richards[1] contends that the prosecutor improperly used a peremptory strike to eliminate a venire-member on account of her race. She also contends that the district court erred in assessing a two-level enhancement in her Sentencing Guidelines offense level for use of a minor to commit a crime and that the district court's sentence was unreasonable under 18 U.S.C. § 3553(a).

Rusty Richards contends that the district court should have severed his case from the others and that he should have been sentenced as a minimal participant.

Flint Thomas Red Feather contends that the district court committed numerous errors in sentencing him.

We reverse Spotted Elk's gun conviction under § 924(c), and remand for resentencing on the remaining counts of conviction; we remand Red Feather's sentence for findings regarding the scope of his joint criminal undertaking and the

---

[1]What appears to be the same surname is variously spelled "Richards" and "Richard" throughout the record. We will adopt the spelling "Richards" as shown in the caption.

foreseeability to him of his co-conspirators' drug transactions; and we affirm in all other respects.

## I.  The Evidence at Trial.

The evidence in this eleven-day trial showed that Geraldine Blue Bird headed up a cocaine sales organization that supplied drug users on the Pine Ridge Oglala Sioux Reservation.  Blue Bird's organization consisted primarily of her extended family and intimate friends, many of whom lived together in a neighborhood in Pine Ridge known as the Igloos, where they retailed cocaine they picked up in Denver.

The charges to be proved were contained in an eight-count indictment, which alleged a conspiracy to distribute cocaine, a conspiracy to distribute marijuana, various discrete acts of possession of cocaine with intent to distribute, and carrying or using firearms during and in relation to drug trafficking violations.[2]

---

[2]The specific charges were as follows:

| Count I | Charged all five defendants and other individuals with conspiracy to distribute and possess five kilograms or more of cocaine with intent to distribute it, in violation of 21 U.S.C. §§ 846 and 841. |
|---|---|
| Count II | Charged Blue Bird, Spotted Elk and other individuals with conspiracy to distribute and possess marijuana with intent to distribute it, in violation of 21 U.S.C. §§ 846 and 841. |
| Count III | Charged Red Feather and Blue Bird with possessing cocaine with intent to distribute it between March and October 2003, in violation of 21 U.S.C. § 841. |
| Count IV | Charged Blue Bird with possessing cocaine with intent to distribute it on or about September 17, 2005, in violation of 21 U.S.C. § 841. |
| Count V | Charged Spotted Elk and another individual with knowingly and intentionally distributing cocaine between November 1, 2005 and December 10, 2005, in violation of 21 U.S.C. § 841. |

The evidence at trial was principally of two kinds: co-conspirators testifying under various arrangements with the government and police officers describing the investigations that led to the arrest of Blue Bird and the other defendants.

The co-conspirator testimony came from Blue Bird's family and friends who had taken part in the drug operation. In rough outline, their testimony showed that the family drug business began with Blue Bird's son Colin Spotted Elk, who began selling marijuana from what was called the "blue house" in the Igloos in the 1990s. Eventually, Blue Bird gained control of what was once her son's business, and by the time of the 2002-2005 period at issue in the indictment, she made the important decisions and controlled the money. Spotted Elk was eventually relegated to the third tier of control, while a succession of three women, Dawnee Frogg, Janine Cottier, and Jody Richards, occupied the position of second in command. Spotted Elk supervised the retail sellers, who called themselves the "Igs" and many of whom had a distinctive tattoo. Rusty Richards and Flint Thomas Red Feather were retail-level sellers, and Red Feather also helped with packaging cocaine, holding cocaine, and counting money. Marvella Richards, Blue Bird's niece, would hold the cocaine and "reup" the retail-level sellers. "Reupping," in their patois, meant turning in the proceeds from one consignment of cocaine, usually an "eight pack" of eight half-gram packets, and receiving a new consignment. The organization charged $50 per half gram of cocaine, but would accept some barter. In particular, Blue Bird would accept electronic benefit

Count VI     Charged Spotted Elk and another individual with using and carrying a firearm during and in relation to the commission of drug trafficking crimes in violation of 18 U.S.C. § 924(c)(1)(A).

Count VII     Charged Blue Bird and two other individuals with possessing cocaine with intent to distribute it on or about December 21, 2005, in violation of 21 U.S.C. § 841.

Count VIII     Charged Blue Bird with using and carrying firearms during and in relation to the commission of drug trafficking crimes, in violation of 18 U.S.C. § 924(c)(1)(A).

(or "EBT") cards which were issued by the government as food assistance, but Blue Bird would discount the cash value of the cards by half or more. The organization also accepted guns in payment for drugs on occasion. Spotted Elk, in particular, was interested in guns, and he authorized Thomas Spotted Bear to accept a gun in exchange for a half gram of cocaine. By the time the business was in full swing in 2005, Blue Bird herself or some group of her associates would travel to Denver about once a month to buy a kilogram of cocaine.

Blue Bird's business was apparently something of an open secret in Pine Ridge, since the stream of customers was so great as to cause traffic jams, particularly on the first of the month, which was pay day on the reservation. In June 2005, Blue Bird moved from the reservation to Rapid City, South Dakota, but many of her family and friends stayed on in her blue trailer and in the blue house in the Igloos.

The trial evidence detailed how police surveilled the houses she owned in the Igloos, as well as the house she had moved into at 629 Indiana in Rapid City, South Dakota, and gradually amassed evidence of the cocaine operation going on at those places. First, early in the morning of March 20, 2005, Oglala Sioux Tribal Police Officer David Whary was dispatched to Blue Bird's blue trailer in the Igloos on a call that someone was being assaulted there. Justin Hawk Wing met the officers outside the trailer and told officers they could go inside, which they did. Once inside, Whary moved through the house in a protective sweep; in plain view he saw pieces of aluminum foil with burn marks, which suggested to him that someone had been smoking cocaine; cut up squares of magazine paper; a pipe; plastic baggies with marijuana in them; and EBT cards in many different names, including names of people who were not in or apparently living in the trailer.

Second, in September 2005, Agents Daniel Cooper of the FBI and Derrick Hill of the ATF conducted a "trash pull," picking up the contents of trash containers set outside the curtilage at the Rapid City house. In the trash, they found burned

aluminum foil and spoons, which are commonly used to smoke or process cocaine, as well as pieces of magazine paper cut up into squares and plastic bags knotted up to allow use of one corner of the bag. They also found notes listing names, amounts of money and quantities, which Agent Cooper testified appeared to him to be a ledger for tracking who had what amounts of drugs. Additionally, the trash yielded a bindle of cocaine weighing .34 ounces.

Third, on September 17, 2005, Officer Whary arrested Blue Bird at Dale Richards' house in Pine Ridge on outstanding warrants (apparently on matters unrelated to drugs). As he took her into the Tribal jail, she asked him how much her bond would be and told him that she had $5,000 in cash in her pocket. Later, during her booking, she did in fact produce almost that amount of cash. While she was being booked, Blue Bird was seen "aggressively" pushing something down in her pants. A female officer, Pamela Janis, took Blue Bird into a private room in order for her to change into jail clothes. Officer Janis noticed Blue Bird moving a cart with her leg. When Blue Bird had changed clothes, Janis looked under the cart and found a package wrapped in duct tape, which contained two plastic baggies, each containing eight bindles of what was later determined to be cocaine. Janis picked up the package off the floor and looked at Blue Bird, who said, "Can I talk to you? I need to talk to you," and, "This is all about my son."

Finally, police closed in on Blue Bird's organization on December 21, 2005, when the manager of the Ramada Inn in Rapid City, South Dakota, smelled what he thought was burning marijuana in the hall of the motel and called the police. The rooms from which the smell seemed to be emanating, Rooms 131 and 133, had been rented that day by Norton Richards. Rapid City Police Officer Ron Terviel responded to the call. He and the hotel manager knocked at the door of Room 131. Terviel saw light fluctuating through the peephole, but no one answered, so the hotel manager moved on to Room 133 and knocked several times. Blue Bird answered the door and consented to allow Terviel to enter the room. He smelled marijuana and saw a baggie

containing four hand-rolled cigarettes on the credenza. Terviel asked Blue Bird's name and ran a warrant check on her, and she volunteered that she had a warrant for driving without proof of insurance. Terviel prepared to arrest Blue Bird, and he asked if she had anything that could stick him if he searched her. She answered that she had cocaine in her pockets, but that it belonged to her son Clarence Behan and she was only holding it for him. In fact, Terviel found six bindles of cocaine in one of Blue Bird's pockets and five bindles in the other. Terviel asked Blue Bird about Norton Richards, who had rented the room. Blue Bird answered that Norton was in the next room, and Terviel asked the other occupant of the room, Jody Richards, if she would knock on the interior door so that he could speak with Norton. Jody knocked and Norton answered the door and walked into Room 133. Terviel walked out into the main hall to speak to the hotel manager; the door to Room 131 was open and through the open door, Terviel saw a bindle on the floor, together with a rolled up dollar bill, which, based on his training, he knew was something people use to snort drugs. Terviel called for back up and assembled all four occupants of Rooms 131 and 133-- Blue Bird, Jody Richards, Wenona Richards and Norton Richards--in Room 133 to wait for a detective to arrive. When Jody Richards complained that she was cold, Terviel saw a jacket on the bed. He asked Blue Bird if it was hers, and she said yes. He got her permission to give the coat to Jody, but when he picked it up, underneath the coat he found two Tupperware containers covered in duct tape. Detective Tony Harrison, who had arrived, picked up the containers and saw white powder inside. Harrison immediately sealed the scene to apply for a search warrant. After the warrant arrived, police seized the Tupperware containers, which contained 56.2 grams of cocaine. The search of the room also produced a backpack that contained ammunition, handguns, $16,500 in cash wrapped in plastic and duct tape, and paper squares of the type used to make bindles. The police also found pieces of tinfoil of the type used for smoking cocaine and plastic packaging with a layer of grease around it, which is a wrapping method drug dealers use to avoid detection by drug-sniffing dogs. Blue Bird's purse contained about $1,000 in cash, wrapped in plastic wrap.

Police also found a first-aid kit box that contained a digital scale, partially folded bindles, and a small plastic bag with cocaine in it.

The next day, Detective Harrison saw a green van parked in the Ramada Inn parking lot; he looked in the window and saw gun barrels sticking out of a trash bag. The van was found to contain four shotguns and six long rifles. It turned out that Blue Bird and Jody, Wenona, and Norton Richards had traveled to the Ramada Inn in that van.

After Blue Bird and the others at the Ramada Inn were arrested on December 21, 2005, federal officials executed a search warrant at the blue trailer in the Igloos, which Blue Bird still owned, but which she had vacated the previous June. Police seized drug paraphernalia and a semi-automatic assault rifle from the trailer.

After Blue Bird's arrest, she was evicted from 629 Indiana. Her landlord consented to a search of the vacated premises, which turned up a green spiral notebook with notes consistent with a drug ledger and an EBT card in the name of Holly Wilson.

The jury found each defendant guilty on each count of the indictment.

## II. Suppression Issues.

Geraldine Blue Bird contends that various pieces of evidence should have been suppressed because they were discovered in violation of the Fourth Amendment or, in the case of statements, resulted from such violations. She challenges police actions in four different episodes: (1) the entry into her house trailer during a party on March 20, 2005; (2) the seizure of her trash from the alley near her house at 629 Indiana in Rapid City in September 2005; (3) the entry into the house of Dale Richards on September 17, 2005 in order to arrest Blue Bird; and (4) the encounter at the Ramada

Inn on December 21, 2005, including the entry into Room 131, the search of the Tupperware containers, and the search the next day of the green van parked outside the Ramada Inn.

Blue Bird made three motions to suppress, and indeed she prevailed in several of her arguments.

In reviewing the district court's rulings on suppression motions, we review for clear error the questions of historical fact, such as who said what. See Ornelas v. United States, 517 U.S. 690, 699 (1996); United States v. Elam, 441 F.3d 601, 603 (8th Cir. 2006). The question of whether a person expressed consent to a search is a question of fact, as is the question of whether such consent was voluntary. United States v. Jones, 254 F.3d 692, 695-96 (8th Cir. 2001). The ultimate question of whether a search violated the Fourth Amendment is a mixed question of fact and law that we review de novo. See Ornelas, 517 U.S. at 696-99; United States v. Wheat, 278 F.3d 722, 725 (8th Cir. 2001).

A.  March 20, 2005 Entry into Blue Bird's House Trailer.

The March 20, 2005[3] entry into Blue Bird's house trailer was precipitated by a 911 call to police. Oglala Sioux Tribal Police Officer David Whary testified at the suppression hearing that he responded to the call, in which someone told the dispatcher that "a female [was] getting assaulted" at Geraldine Blue Bird's double-wide trailer. When he arrived there, other officers were already there, waiting for

---

[3]The government did not include argument sections addressing the March 20, 2005 search or the September 17, 2005 arrest, although it did address each of these incidents in its statement of facts, including the salient facts on which the district court's rulings depend. At oral argument, the United States Attorney informed us that the omission was an oversight and that the government does indeed contend that the district court's rulings were correct.

backup. They told him that Justin Hawk Wing told them that "Kim Pacer was flashing a knife . . . looking for her boyfriend and was threatening subjects in the house with the knife." They said that Hawk Wing had invited the officers to go into the trailer. Whary walked in the front door and began a protective sweep of the trailer because the officers had heard rumors that the people at the trailer wanted to have a shoot-out with the police. The door to the east bedroom was locked, but the people inside the bedroom came out; when they did, Whary saw a "gray package bundle" or "duct tape package" sitting inside an open cabinet. In the bathroom, he saw burnt pieces of aluminum foil, a burnt piece of glass pipe, and plastic bags ripped open. There was a safe in the living room, a gun and ammunition in plain view, and numerous EBT or electronic food stamp cards.

The police seized the guns, ammunition, foil, a crack pipe, and EBT cards, all of which were exposed to their plain view once they entered the trailer. Blue Bird moved to suppress the evidence on the ground that the police violated the Fourth Amendment when they entered her residence without a warrant. The district court found that the police acted reasonably in response to exigent circumstances:

> Whary and his fellow officers reasonably believed that an emergency situation, namely an assault, was occurring at the Blue Bird home. Under the "emergency exception" to the warrant requirement, their entry into the Blue Bird home was justified. The officers did not act outside their justification for entrance in moving through the home in an attempt to find the reported assault victim.

Generally, the Fourth Amendment requires the police to obtain a warrant before entering a home. Payton v. New York, 445 U.S. 573, 590 (1980). Where, as here, the police have entered a defendant's house without a warrant, the burden is on the prosecution to prove that the police acted pursuant to a valid exception to the warrant requirement. United States v. Weston, 443 F.3d 661, 667 (8th Cir.), cert. denied, 127 S. Ct. 417 (2006). One exception is that police are allowed to enter a home without

-12-

waiting for a warrant in the face of certain exigent circumstances, such as when they reasonably believe that a person within is in need of immediate aid. Brigham City v. Stuart, 547 U.S. 398, 403 (2006); Mincey v. Arizona, 437 U.S. 385, 392 (1978). When police have lawfully entered the house in response to exigent circumstances, they may conduct a protective sweep, or cursory inspection of places where a person might be, if the facts would justify a reasonable officer in believing that there might be someone dangerous in the house. United States v. Williams, 431 F.3d 1115, 1118 (8th Cir. 2005); United States v. Pruneda, 518 F.3d 597, 603 (8th Cir. 2008). Once lawfully inside the home, police may seize obviously incriminating items that are in plain view and that can be reached from somewhere the officer has a right to be. United States v. Chipps, 410 F.3d 438, 442-43 (8th Cir. 2005); Williams, 431 F.3d at 1118; see United States v. Banks, 514 F.3d 769, 773 (8th Cir.) (plain view doctrine generally), cert. denied, 128 S. Ct. 2919 (2008).

Blue Bird contends that there were "no facts supporting the report that any person had been assaulted or injured." To the contrary, Justin Hawk Wing told the officers on the spot that Kim Pacer was "flashing a knife" and that she "was looking for her boyfriend and was threatening subjects in the house with the knife." Police in fact found Kim Pacer in the trailer and arrested her. This was adequate evidence to justify the police entry of the trailer in order to prevent violence and restore order. See Stuart, 547 U.S. at 406 ("The role of a peace officer includes preventing violence and restoring order, not simply rendering first aid to casualties; an officer is not like a boxing (or hockey) referee, poised to stop a bout only if it becomes too one-sided.").

B. Entry into Dale Richards' Home on September 17, 2005.

Blue Bird also contends there was a Fourth Amendment violation when police entered the home of Dale Richards on September 17, 2005 to arrest her; accordingly, she contends that the court should have suppressed the cocaine that was found on the dressing room floor of the police station where she changed clothes and statements she

made while in custody. Blue Bird argues that the district court erred in holding that Justin Hawk Wing had authority to consent to the police's entry of Richards' trailer, where they found and arrested her.

Here, police had an arrest warrant, but they executed the warrant by entering a third person's home. In the absence of exigent circumstances or other exception to the warrant requirement, police seeking to execute an arrest warrant for one person at someone else's home need a search warrant to enter the third person's house. Steagald v. United States, 451 U.S. 204, 211-16 (1981).

The police may enter and search a person's house with the voluntarily given consent of that person or with the consent of a third party who shares "common authority over the premises or effects" to be searched, United States v. Matlock, 415 U.S. 164, 170 (1974), provided that the person does not object, see Georgia v. Randolph, 547 U.S. 103, 122-23 (2006); United States v. Hudspeth, 518 F.3d 954, 960-61 (8th Cir. 2008) (en banc) (holding that defendant must be physically present to overrule third party's consent). Whether the third party expresses consent is a question of fact. See Iron Wing v. United States, 34 F.3d 662, 665 (8th Cir. 1994); see also United States v. Jones, 254 F.3d 692, 695 (8th Cir. 2001) ("The determination of whether Jones expressed consent is a question of fact, which we review for clear error."). Whether the consenter had common authority over the premises is also a question of fact and is determined by the existence of "mutual use, joint access, and control." United States v. James, 353 F.3d 606, 613 (8th Cir. 2003). However, whether the reliance by police on indicia of common authority was reasonable is a question of law that we review de novo. Id. at 615; Weston, 443 F.3d at 668.

Officer Whary arrived at the Dale Richards residence on September 17, 2005 with an arrest warrant for Blue Bird, having been told by an informant's telephone call that she was at Richards' trailer. When Whary arrived, Justin Hawk Wing was standing in front of Richards' trailer. Whary testified that he had called at Dale Richards' trailer

-14-

"dozens and dozens of times" and that he had encountered Hawk Wing there many times, including times when Hawk Wing was sleeping there. Whary testified that Hawk Wing appeared to be living at the trailer. Whary asked Hawk Wing, "Is Geraldine home?" Hawk Wing replied, "I don't know. Go look," and he pointed toward the trailer. Interpreting the gesture as an invitation, Whary walked up to the door of the trailer, knocked, and went inside. He encountered Richards, who did not object to his entry. Whary walked to a bedroom, where he saw Blue Bird sitting on a mattress on the floor, and he arrested her.

The district court found,

> Whary's determination that Hawk Wing had common authority over Richards' home, based upon his belief that Hawk Wing lived in the home, was reasonable. Therefore Hawk Wing's consent to enter the trailer was effective. Further, immediately after Whary entered Richards' home, he encountered Richards who gave no indication that he did not consent to his presence.

Blue Bird argues, "There were no facts establishing that Justin Hawk Wing had any authority whatsoever to authorize entrance into the Richards residence." Whary testified that he had seen Justin Hawk Wing at the Richards trailer many times, including times when Hawk Wing was asleep there, and that Hawk Wing appeared to be living there. When asked if Blue Bird was in the trailer, Hawk Wing invited Whary to go inside and see for himself whether Blue Bird was in the trailer, thus exercising a prerogative of admitting strangers into the house, which would be proper only for an inmate of the house. This is adequate evidence on which a reasonable officer could base a conclusion that Hawk Wing had authority to consent to entry into the trailer. See Weston, 443 F.3d at 668; United States v. Janis, 387 F.3d 682, 687 (8th Cir. 2004).

## C. Trash Pull at 629 Indiana.

Blue Bird contends that the district court should have suppressed evidence the police retrieved from trash cans left at the curb of Blue Bird's house at 629 Indiana in Rapid City, South Dakota in September 2005. Blue Bird did not move to suppress this evidence before trial; she argues she did not know before trial that the trash had been seized, but that when she found out, she made a trial objection, which was overruled. The government contends that a suppression motion must be made before trial, see Fed. R. Crim. P. 12(b)(3)(C) (including suppression motion as one that "must be made before trial"), and that this issue is either nonreviewable or, at most, reviewable as plain error. See United States v. Frazier, 280 F.3d 835, 845 (8th Cir. 2002).

It is not necessary to belabor the applicable standard of review, or indeed to decide whether the issue is reviewable, since the district court did not err under any standard in admitting the evidence. FBI Agent Dan Cooper testified that he removed two trash containers that were "set out" in the alley outside the fence at 629 Indiana. Inside the trash containers, he found burnt foil, baggies, paper with notations that could be drug transaction ledgers, a bindle containing .34 grams of cocaine, and miscellaneous other items that Cooper connected with the drug trade. Police may search trash left outside the curtilage of the house to be picked up by garbage collectors, because the owners of the trash have abandoned it. California v. Greenwood, 486 U.S. 35, 40-43 (1988); United States v. Trice, 864 F.2d 1421, 1423-24 (8th Cir. 1988) (trash in trash cans at the curb for pickup). Just so, here. The garbage was in the alley, outside the fence. Blue Bird could not prevail on this argument no matter what standard of review we applied.

## D. Entry and Searches at Ramada Inn.

Blue Bird contends that her Fourth Amendment rights were violated in various respects by the actions of police on December 21, 2005, when they entered her motel

room at the Ramada Inn in Rapid City, and on the next day, when they looked through the windows of a van in the parking lot there.

On December 21, Blue Bird and Jody Richards were occupying Room 133 at the Ramada, and Norton and Wenona Richards were in Room 131. Norton Richards had rented both rooms. Josh Uhre, the motel manager, smelled something like marijuana or "foilers" (cocaine and baking soda burned in foil) coming from the vicinity of those rooms. He also saw a man in the hall wearing a shirt with a picture of a marijuana leaf. Someone from the motel called the police, and when Officer Ron Terviel arrived, Uhre went down with Terviel to the rooms. First, they knocked on the door of Room 131, and Uhre said, "Front desk," but no one answered. Terviel peeked in the peephole and saw some movement. They moved over to Room 133 and knocked and announced "Front desk," and Uhre said through the door that someone was smoking marijuana. Geraldine Blue Bird opened the door. Terviel asked if it was her room, to which she said yes, and then he asked if he could come in, to which she also answered yes. Terviel noticed the smell of marijuana and he saw a bag of marijuana cigarettes in plain view on the credenza or dresser. He asked Blue Bird her name, and when she told him, he found she had an outstanding warrant for driving without insurance. He took her into custody. He asked her where Norton Richards was, and Blue Bird said he was in the other room. Jody Richards knocked on the door by which Rooms 131 and 133 communicated; Norton Richards opened the door and came in to Room 133, while Jody crossed over into Room 131. Officer Terviel asked Blue Bird if there was anything he should know about before searching her, and she said she would like to speak to him and that she had cocaine in her pockets. Terviel searched her pockets and found a baggie full of bindles. Blue Bird volunteered that the bindles belonged to her son, but Terviel warned her not to speak before receiving her Miranda warnings.

Terviel went into the hall to speak to Uhre, and while he was out there, Jody Richards opened the door and stuck out her head. Through the open door, Terviel

-17-

could see another bindle and a rolled-up dollar bill, which he said is associated with cocaine use. Terviel called for backup. As everyone was sitting in the room waiting for more officers to arrive, the rooms became cold because the officers had opened the windows (presumably to fumigate). When Jody Richards complained of the cold, Terviel saw a coat on the bed and asked Blue Bird if it was her coat and if he could give it to Jody. With Blue Bird's consent, he picked up the coat and thereby revealed two Tupperware containers sitting under the coat, sealed with duct tape. Another officer, Detective Harrison, picked up a Tupperware container and Terviel could see that there was something white and powdery in it.

At that point, Detective Harrison said to stop everything, that they would get a search warrant for the room. Armed with the search warrant, police found weapons, cash, drug paraphernalia, and controlled substances.

The next morning, Detective Harrison returned to the Ramada Inn with a set of keys that had been seized the previous day. He looked in the window of a van parked in the Ramada Inn parking lot and saw the barrels of two guns sticking out from a trash bag. He used the keys to open the van and found four shotguns and six long rifles.

Blue Bird moved to suppress the items found in the motel rooms, as well as the statements she made to Officer Terviel. The district court denied the suppression motion, finding that Blue Bird voluntarily consented to Terviel's entrance into her room, that the marijuana cigarettes were in plain view in the room, and that Norton Richards voluntarily consented to Terviel's entry into his room, where more incriminating evidence was readily apparent. Further, the district court held that the statements by Blue Bird to Terviel were not the product of interrogation, but instead were volunteered by Blue Bird. She did not include the evidence of the guns in the van in her pre-trial suppression motion, though she objected to the evidence at trial, and the district court overruled her motion on the ground that it was not her van and she had no standing to object.

-18-

On appeal, Blue Bird attacks Terviel's entry into Blue Bird's room, arguing that Terviel lacked probable cause to knock on the door of Room 133, that by looking in the peephole in the door of Room 131, he committed an unreasonable search, and that Blue Bird did not voluntarily consent to his entry of her room.

First, it does not violate the Fourth Amendment merely to knock on a door without probable cause. United States v. Cruz-Mendez, 467 F.3d 1260, 1264 (10th Cir. 2006) ("As commonly understood, a 'knock and talk' is a consensual encounter and therefore does not contravene the Fourth Amendment, even absent reasonable suspicion."), cert. denied, 127 S. Ct. 1027 (2007); see United States v. Weston, 443 F.3d 661, 667 (8th Cir. 2006) (police did not violate Fourth Amendment when they entered defendant's curtilage for legitimate purpose of seeking voluntary conversation and consent to search). Officer Terviel and Uhre stood in a public hallway and knocked on the door. "[N]o Fourth Amendment search occurs when police officers who enter private property restrict their movements to those areas generally made accessible to visitors--such as driveways, walkways, or similar passageways." United States v. Reed, 733 F.2d 492, 501 (8th Cir. 1994). While a police attempt to "knock and talk" can become coercive if the police assert their authority, refuse to leave, or otherwise make the people inside feel they cannot refuse to open up, United States v. Poe, 462 F.3d 997, 1000 (8th Cir. 2006); United States v. Connor, 127 F.3d 663, 666 (8th Cir. 1997), in this case there are no facts that would show that Blue Bird had reason to feel she had to open up. The encounter happened in mid-day, Terviel did not command her to open the door, nor was there any suggestion that his knocking was unusually persistent. See United States v. Crapser, 472 F.3d 1141, 1146-47 (9th Cir. 2007). The district court found that Blue Bird opened the door of the motel room of her own accord, and that finding is not clearly erroneous.

Second, whether or not looking into a peephole is a search, Officer Terviel did not see anything incriminating when he looked in, so there is no causal connection between the peeping and the later discovery of evidence that Blue Bird would like suppressed. A constitutional violation does not call for suppression of physical

-19-

evidence or statements when the violation did not cause the discovery of the evidence or the utterance of the statements. United States v. Olivera-Mendez, 484 F.3d 505, 511 (8th Cir. 2007).

Third, the district court's finding, under the guidance of United States v. Chaidez, 906 F.2d 377, 380-81 (8th Cir. 1990), of voluntary consent to entry of Room 133 was not clearly erroneous. The district court found that "Blue Bird answered the door to the room on her own accord," "she was not in custody when she gave Terviel permission to enter the room," "Terviel never raised his voice or threatened Blue Bird," and "Blue Bird is a mature adult who was familiar with the workings of the criminal justice system." In arguing that her consent was not voluntary, Blue Bird relies on various of her personal characteristics (physical impairments resulting from obesity, cocaine intoxication, etc.), of which she adduced no evidence at the suppression hearing and which are not mentioned in her motion to suppress. We cannot conclude the district court erred in not finding facts based on evidence not presented to it, nor would we conclude that the facts Blue Bird now urges would have rendered the district court's findings clearly erroneous even if they had been developed below.

Next, Blue Bird contends that the district court erred in refusing to suppress the contents of the Tupperware containers because the police entry into the room was illegal, an argument we have already rejected, and because the police opened the containers without a warrant.[4] Blue Bird did not argue in her suppression motion that the containers were opened without a warrant, and the only testimony before the district court on the suppression motion was that the officers stopped once they discovered the Tupperware containers and proceeded to get a search warrant before searching the motel rooms. Later, at trial, Jody Richards testified that Officer Harrison opened up the container on the spot, which implies that he did not wait for the warrant.

---

[4]Blue Bird does not argue that by picking up the container, Harrison "searched" the container. See generally Arizona v. Hicks, 480 U.S. 321 (1987).

Blue Bird does not contend that she asked the district court to suppress the contents of the containers based on Jody Richards' trial testimony.

Federal Rule of Criminal Procedure 12(b)(3)(C) and (e) provides that motions to suppress evidence must be raised before trial or are waived, and the waiver provision "applies not only to the failure to make a pretrial motion, but also to the failure to include a particular argument in the motion." United States v. Barajas-Chavez, 358 F.3d 1263, 1266-67 (10th Cir. 2004) (internal quotation marks omitted); see generally 1A Charles Alan Wright & Andrew D. Leipold, Federal Practice & Procedure Criminal § 193 at 424-26 (4th ed. 2008). The district court could hardly be faulted for failing to grant the suppression motion on the basis of facts not presented to it, and Blue Bird did not renew her motion in light of Jody Richards' testimony. Even if Blue Bird had presented Jody Richards' testimony at the motion to suppress, Richards' testimony was contradicted by the trial testimony of Officer Harrison, who said the containers were not opened until the next day at the evidence facility. Presumably, the government would have countered Richards' story with its contrary version of the facts. Therefore, even if we were to review this point for plain error, we would have to conclude that any error was not plain.

Blue Bird also contended at oral argument that even after the search warrant was obtained, it did not authorize the search of the Tupperware containers because it did not mention them. Our review of the warrant (not supplied to us by counsel) indicates that this argument is unfounded, since the warrant specifically mentions "containers . . . used in packaging or delivering contraband substances."

Finally, Blue Bird contends that the district court should have suppressed the guns that Detective Harrison discovered by looking through the windows of the green van belonging to Darrell or Melinda Spotted Elk, which was parked outside the Ramada Inn. Blue Bird did not move before trial to suppress this evidence, but instead objected when Harrison testified at trial about seeing the guns. After Blue Bird's counsel objected, he then informed the court that the van was not Blue Bird's. The

district court said that it would appear that Blue Bird did not have standing to object to the search, unless counsel was "aware of something that would give her standing." To this, counsel replied, "It's not our vehicle." On appeal, Blue Bird contends that she has standing because she had been a passenger in the van on December 21, the day before Detective Harrison saw the guns. The general rule is that "a person has no reasonable expectation of privacy in an automobile belonging to another." United States v. Green, 275 F.3d 694, 699 (8th Cir. 2001). Blue Bird cites Brendlin v. California, 127 S. Ct. 2400 (2007), in which a passenger who was in the car at the time of a traffic stop was deemed "seized" and thus had standing to challenge the stop. Blue Bird does not cite any authority for the proposition that a person who was a passenger in the past retains standing to challenge future searches of someone else's car. Even assuming this argument for suppression is reviewable despite Blue Bird's waiver under Rule 12(e), the district court did not plainly err in admitting evidence about the guns.

## III. Severance Motion.

Rusty Richards argues that the district court erred in denying his motion to sever his case from those of the other defendants.

Rusty Richards was indicted on Count I, conspiracy to possess with intent to distribute, and to distribute, five kilograms or more of cocaine. Fifteen other defendants were indicted in Count I, and there were seven additional counts that did not name Rusty Richards. Ultimately, five defendants proceeded to trial. Before trial, Rusty Richards moved to sever his case from that of Geraldine Blue Bird and Colin Spotted Elk, arguing that the extensive evidence against those two created a danger that Rusty Richards would be found guilty by association. The district court held that the indictment properly joined the various counts, which all involved illicit possession and distribution of controlled substances over a relatively short period of time and which were all related to the conspiracy alleged in Count I. Once joinder was shown to be proper, the district court reasoned that the burden fell on Rusty Richards to demonstrate that a joint trial would result in real prejudice to him. The district court

held that Rusty Richards had not come forward with any reason to believe that a joint trial would prejudice him. The district court instructed the jury that each defendant was entitled to have his or her case decided solely on the evidence that applied to him or her and that some of the evidence in the case applied only to some defendants and could not be considered against others.

We review for abuse of discretion the district court's denial of a severance motion. United States v. Frazier, 280 F.3d 835, 844 (8th Cir. 2002). The burden is on the defendant to show that he was clearly prejudiced by the joint trial, and "it will be the rare case, if ever, where a district court should sever the trial of alleged coconspirators." Id. Severance is appropriate "only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." Zafiro v. United States, 506 U.S. 534, 539 (1993).

Rusty Richards argues that his involvement in the conspiracy was less extensive and less culpable than that of the other defendants. Joint trial of defendants with markedly varying degrees of involvement and culpability presents an acknowledged risk of prejudice, id. at 539, but in a particular case the district court may properly conclude that the risk can be addressed by means other than severance, such as curative jury instructions. Id. As a practical matter, disparity among the defendants in extent of involvement and culpability is commonplace in conspiracy cases and does not alone show the kind of prejudice that would require a district court to sever, rather than to respond with some less drastic measure such as a curative instruction. See Frazier, 280 F.3d at 844; United States v. Lee, 374 F.3d 637, 646 (8th Cir. 2004) ("It is not an abuse of discretion to deny a severance motion when not every joined defendant has participated in every offense charged . . . or when there is varying strength in the evidence against each defendant."). Here, the district court instructed the jury to try each defendant solely on the evidence applicable to that defendant. Rusty Richards has given us no reason to conclude that this was not an adequate safeguard in his case or that the district court abused its discretion in refusing to sever.

-23-

IV. Jury Selection Issues.

Blue Bird argues that her case should be reversed because of the district court's refusal to strike a venire-member for cause. This argument need not detain us, for the record shows that the venire-member, Pat Schommer, did not serve on Blue Bird's jury. Even if Blue Bird used one of her peremptory challenges to strike Schommer, the jury that convicted her did not contain the venire-member she complains was biased, and therefore Blue Bird has not been deprived of any constitutional right. See United States v. Martinez-Salazar, 528 U.S. 304, 317 (2000); United States v. Nelson, 347 F.3d 701, 710 (8th Cir. 2003).

Blue Bird and Marvella Richards contend that the government violated the equal protection clause by making a peremptory challenge to venire-member Ethel Kills Straight, a Native American, with the motivation of eliminating her because of her race. Under Batson v. Kentucky, 476 U.S. 79 (1986), if a defendant claims that the prosecution exercised a peremptory challenge based on the venire-member's race, the trial court must proceed in three steps: First, the defendant must make a prima facie case that the prosecution's strike was motivated by race; second, the prosecution must offer a race-neutral reason for the strike; and third, taking into account all the evidence, the trial court must find whether or not the prosecutor was motivated by purposeful discrimination. Snyder v. Louisiana, 128 S. Ct. 1203, 1207 (2008). We review the trial court's factual determination for clear error. Id.

In this case, at voir dire, the court read off a list of potential witnesses and asked the venire whether they knew the witnesses. Kills Straight stated that she knew Melvin Sierra and Darwin Apple and Apple's wife Babette Thin Elk. In fact, Darwin Apple was her husband's nephew, and he and his wife typically came to Kills Straight's Sun Dance. No one explained on the record what is involved in a Sun Dance or whether it has more than a social significance. When asked whether she could evaluate those

-24-

witnesses' testimony "just like anyone else that's testifying," Kills Straight answered, "Yes."

After the government exercised a peremptory challenge to strike Kills Straight, Blue Bird and Marvella Richards made a <u>Batson</u> challenge. The district court held that Kills Straight's Native American race made a prima facie case under <u>Batson</u>, and so the burden shifted to the government to come forward with a race-neutral reason for its challenge. The prosecutor stated that Kills Straight had a familial relationship with two witnesses who were proposed character witnesses for Blue Bird and also attended Sun Dances with them, which might make her more willing to believe those witnesses. At that point, Blue Bird's lawyer offered to stipulate that he would not call any of the three witnesses Kills Straight knew if the government would withdraw its challenge. The prosecutor did not accept that offer, and the district court ruled that Kills Straight was the only juror who had a familial relationship with defense witnesses, which was a valid, race-neutral reason for the prosecutor to strike her.

The district court denied the <u>Batson</u> motion, finding:

> I believe the government has met their burden of stating a reason that is not race-based for striking Ms. Kills Straight. As I recall, Ms. Kill Straight is the only one who had a familial relationship with any of the witnesses who are identified. And although Ms. Schommer knew some of the witnesses, it was based solely on a business relationship. And if I recall correctly, the witnesses that she was familiar with were both government and defense witnesses. Ms. Kills Straight only knew witnesses that were being called by the defendant, so I find that the government has met their burden and the motion for the <u>Batson</u> challenge is denied.

Blue Bird and Marvella Richards contend that the prosecution's avowed reason for striking Kills Straight is pretextual because Schommer also knew potential witnesses and the government did not strike her. The district court found that Schommer and Kills Straight were not similarly situated because only Kills Straight

was related to the witnesses. The government was entitled to surmise that blood is thicker than water. Moreover, Schommer had business relationships with witnesses for both sides, whereas Kills Straight only knew defense witnesses, which indicated a greater potential for pro-defendant bias on Kills Straight's part. Accordingly, the district court held that the evidence did not establish that the prosecution had acted out of purposeful racial discrimination. These findings are not clearly erroneous.

Blue Bird and Marvella Richards also argue before us that Blue Bird's proposed stipulation not to call the witnesses eliminated the government's reason for striking Kills Straight. They point to no authority that the government was obliged to accept such a stipulation after voir dire was over, and we decline to adopt a new rule that the government must negotiate its peremptories or run afoul of Batson.

## V. Discovery Issue.

Blue Bird contends that the government failed to comply with Fed. R. Crim. P. 16(a)(1)(E) by failing to produce a copy of the warrant used to search Blue Bird's blue trailer in the Igloos, on December 21, 2005. The prosecutor contended that she had not produced the warrant and accompanying affidavit because there was an issue about protecting the identity of a juvenile in a related case, but that she had produced a copy of Agent Derrick Hill's report outlining the contents of the warrant. The district court inquired whether defense counsel had in fact received the report, and Blue Bird's counsel said he could not represent to the court that he had not received the report, but he moved to suppress the fruits of the search on the ground that the search violated the Fourth Amendment. The district court did not hold Blue Bird to the terms of Fed. R. Crim. P. 12(b)(3)(C), requiring motions to suppress to be made before trial, but instead considered the motion to suppress on its merits. Because Blue Bird's counsel maintained that Blue Bird had moved out of the trailer six months before the search and had no control over the trailer, the district court held that she had no standing to object to the search on Fourth Amendment grounds. Because other defendants

objected, however, and it appeared they might have standing, the district court held a suppression hearing.

After the suppression hearing, the court held that the government had not failed in its duty under Fed. R. Crim. P. 16(a)(1)(E) by failing to produce the warrant because it produced a copy of Derrick Hill's report describing the warrant and search, which would have informed the defendants of the existence of the warrant; the search warrant itself was a public record, which was available to the defendants in the court files without the need for the government to produce it; and the government produced pictures of all the seized evidence before trial, as required, and the defendants did not move to suppress the evidence. Moreover, reaching the merits, the court held that Blue Bird lacked standing to object to the search of the trailer, even though she held title to it, because she was not living there and apparently others were, so that Blue Bird was like a landlord who is not occupying the property. The court held that even if some statements in the affidavit supporting the warrant were deemed untrue, the warrant would still have been supported by probable cause, and in any case, the agents acted in good faith in executing the warrant.

The district court's decision not to exclude evidence under Rule 16 is reviewable for abuse of discretion. United States v. Tibesar, 894 F.2d 317, 319 (8th Cir. 1990). Subsidiary factual findings are reviewed for clear error. Id. The district court found that the government produced a report that should have alerted the defendants to the existence of the warrant, which was a public record, see United States v. Bremer, 482 F. Supp. 821, 825 (W. D. Okla. 1979), and that the government also properly produced pictures of the evidence seized pursuant to the search. Moreover, in light of the court's waiver of the requirement that suppression motions be made before trial and the court's findings that the search and warrant were lawful, the defendants cannot show they were prejudiced by the fact that their lawyers were apparently unaware of the search until Hill testified about it at trial. Blue Bird has by no means shown that the district court abused its discretion in permitting the government to introduce evidence concerning the fruits of the search.

-27-

## VI. Evidentiary Issues.
### A.  Co-conspirator Statements.

Blue Bird argues that the district court admitted some twenty statements as nonhearsay under Fed. R. Evid. 801(d)(2)(E) without making individualized findings that the statements were made during the course of the conspiracy and in furtherance of it, as required by the Rule.  More specifically, the Rule requires that in order to admit such statements, the district court find by a preponderance of the evidence that a conspiracy existed involving the declarant and the party against whom the statement is offered and that the statements were made by the declarant in the course of and in furtherance of the conspiracy.  Bourjaily v. United States, 483 U.S. 171, 175 (1987).

These extensive foundational requirements of Rule 801(d)(2)(E) would pose a logistical problem in ordering the evidence if the proponent had to establish each premise before being allowed to introduce the statements themselves.  In United States v. Bell, 573 F.2d 1040, 1044 (8th Cir. 1978), we prescribed the procedure appropriate when a party offers a statement into evidence that would be hearsay if it did not meet the requirements of Rule 801(d)(2)(E).  In such a case (and upon objection), the district court may caution the parties, outside the hearing of the jury, that the statement will be admitted conditionally, subject to the proponent establishing the foundational elements during the course of trial.  Bell, 573 F.2d at 1044.  At the conclusion of the evidence, the district court must then make an explicit finding as to whether the proponent established the foundational elements; if not, the district court must determine the proper remedy, which may be an instruction striking the conditionally admitted statements or, where necessary, a mistrial.  Id.

In this case, at the pre-trial conference the district court outlined the Bell procedure and declared her intent to follow it, then repeated the discussion outside the hearing of the jury in response to a hearsay objection at trial.  At that time, the court found that the government had established that there was a conspiracy.  At the close of the evidence, the court stated that she was making her Bell finding.  She stated the

Rule 801(d)(2)(E) foundational elements, then said, "In those instances where I overruled the objections [during trial], I specifically found by overruling the objection that the declarations were made during the course [and in] furtherance of the conspiracy." She also stated that she had upheld some objections at trial because she found that the declarations in question had not been made in furtherance of the conspiracy.

Blue Bird now argues that the district court erred in not making specific findings as to each of the twenty statements. Blue Bird, however, does not point out any particular statement as to which the foundational requirements were not met, nor does she contend that she argued to the district court that the court had not complied with Bell. We do not apply Bell mechanically to compel reversals where no prejudice is shown. United States v. Cazares, 521 F.3d 991, 998 n.5 (8th Cir. 2008) (substantial compliance with Bell is sufficient); United States v. Roulette, 75 F.3d 418, 424-25 (8th Cir. 1996). Blue Bird has neither identified any particular statement as to which the foundational elements are missing, nor has she shown any prejudice she suffered from the lack of a specific ruling as to each statement. Blue Bird's own argument suffers from the very same defect of generality about which she complains--the twenty statements are lumped together in her brief, with no particular argument about particular statements. Blue Bird's descriptions of the statements show that many were patently in furtherance of the conspiracy, being statements facilitating commerce in drugs or guns. Blue Bird may not put the burden on this court to sift through her undifferentiated argument in search of error. See United States v. Vanhorn, 296 F.3d 713, 717 (8th Cir. 2002). She has not shown an abuse of discretion.

## B. Bruton Issue.

Spotted Elk contends that there was a violation of his Sixth Amendment right to confront the witnesses against him when Dawnee Frogg testified that she and Blue Bird had a conversation while they were in jail concerning "what to say" and the need to "keep it between her [Blue Bird], Colin [Spotted Elk], Justin Hawk [Wing] and Sage

[Richards]." Frogg said Blue Bird told her to say that Blue Bird's money came from "the powwows, and her sugar shack, [and] her embroidery machine," whereas Frogg said that in fact Blue Bird's money came from drugs. Because Blue Bird did not testify at trial, Spotted Elk could not confront her about this conversation, and he moved for a mistrial on this basis, which the district court denied.

In Bruton v. United States, 391 U.S. 123, 135-36 (1968), the Supreme Court held that introducing an out-of-court confession by a non-testifying defendant violated the Confrontation Clause rights of a co-defendant who was incriminated by the statement. In the years since Bruton, the Supreme Court has clarified the scope of the Confrontation Clause in Crawford v. Washington, 541 U.S. 36, 53-54 (2004), Davis v. Washington, 547 U.S. 813, 821-22 (2006), and Giles v. California, 128 S. Ct. 2678 (2008). It is now clear that the Confrontation Clause does not apply to non-testimonial statements by an out-of-court declarant. Davis, 547 U.S. at 823-26; Whorton v. Bockting, 127 S. Ct. 1173, 1183 (2007) ("[T]he Confrontation Clause has no application to [non-testimonial out-of-court statements]"). Blue Bird's reported utterance was not a statement of fact, but a proposal of a future course of action (i.e., what to say in the future), uttered not to any official, but to a co-defendant. See Davis, 547 U.S. at 822 (testimonial statements describe past events); United States v. Singh, 494 F.3d 653, 658-59 (8th Cir.) (co-conspirators' statements in furtherance of the conspiracy were not testimonial under Crawford), cert. denied, 128 S. Ct. 528 (2007). Blue Bird's reported words were not testimonial, and therefore Frogg's account of them could not violate Spotted Elk's Sixth Amendment rights.

## C. Police Officer Testimony.

Blue Bird contends that various police officers rendered opinions for which there was no adequate foundation. We review the district court's admission of evidence for abuse of discretion. Old Chief v. United States, 519 U.S. 172, 174 n.1 (1997).

Blue Bird contends that Detective Tony Harrison was allowed to testify without personal knowledge (1) that the reason the cash found in the Ramada Inn was wrapped in Saran wrap was to mask the odor of substances on the bills to prevent detection by police dogs; (2) that the reason there was a layer of grease outside the packaging for cocaine was also to mask the smell; and (3) that little pieces of tinfoil found in the Ramada Inn were used to smoke cocaine. At the time of trial, Harrison had been a police officer for ten years and was assigned to the Unified Narcotics Enforcement Team. Harrison testified at length about his training and experience in investigating drug cases, including hundreds of hours of training by the Bureau of Alcohol, Tobacco and Firearms and the Drug Enforcement Agency.

> Federal Rule of Evidence 702 permits a district court to allow the testimony of a witness whose knowledge, skill, training, experience or education will assist a trier of fact in understanding an area involving specialized subject matter. It is well within the discretion of a district court to allow law enforcement officials to testify as experts concerning the modus operandi of drug dealers in areas concerning activities which are not something with which most jurors are familiar.

United States v. Solorio-Tafolla, 324 F.3d 964, 966 (8th Cir. 2003) (internal quotation marks and citations omitted). Harrison established that he had the expertise necessary to assist the jury in understanding how the pieces of evidence found in the course of the search of the Ramada Inn and Blue Bird's house would have been used by drug dealers and users. Therefore, he was correctly permitted to testify about how the items would typically be used by drug users and dealers, although he had no personal knowledge that the particular items in question had in fact been so used. The usefulness of Harrison's testimony was not outweighed by the dangers of unfair prejudice, confusion of issues, or misleading the jury. See Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579, 595 (1993). The district court did not abuse its discretion in admitting it.

Blue Bird also argues that the district court erred in admitting the expert testimony of Jon Dicks about the fingerprints on the Tupperware containers without first conducting a Daubert hearing. The record shows that before ever eliciting an opinion, the prosecutor established that Dicks had received extensive training in fingerprinting and that his methods were "accepted in the scientific community, in the law enforcement community, and the legal system." Moreover, later in Dicks' testimony, he said that his work in this case was peer-reviewed by a nationally recognized fingerprint examiner, Sergeant Detective Jordahl. Blue Bird does not point to anything questionable about Dicks' methodology or the underlying science he employed; "Fingerprint evidence and analysis is generally accepted." United States v. Collins, 340 F.3d 672, 682 (8th Cir. 2003); accord United States v. Janis, 387 F.3d 682, 689 (8th Cir. 2004). A Daubert hearing is not required where the record already establishes that the testimony is admissible. See Solorio-Tafolla, 324 F.3d at 965-66. "When a district court is satisfied with an expert's education, training, and experience, and the expert's testimony is reasonably based on that education, training, and experience, the court does not abuse its discretion by admitting the testimony without a preliminary hearing." United States v. Kenyon, 481 F.3d 1054, 1061 (8th Cir. 2007).

Blue Bird did not object to Dicks' opinion itself, but to the exhibit comparing Blue Bird's prints to the prints lifted from the duct tape on the Tupperware containers. Thus, Blue Bird did not properly preserve any Daubert objection. Blue Bird did not offer to the district court any plausible reason why Dicks' opinion would not be admissible under Daubert, nor does she offer any such reason to this court. Even reviewing the point as if it were properly preserved, we see no abuse of discretion in admitting Dicks' opinion testimony.

Blue Bird also contends that the district court erred in admitting the testimony of Agents Derrick Hill and Dan Cooper. Hill had testified to extensive training in narcotics investigation, and his opinion was within the scope of that expertise. As to Agent Cooper, he also testified as to extensive training and experience in drug

investigations before rendering an opinion. When defense counsel objected and requested a <u>Daubert</u> hearing, the district court said:

> [The motion is] Denied because there's been sufficient foundation stated for [the] opinion that he's given. If we had had the hearing, I would have allowed the evidence to come in, so there's no prejudice to your client. There's no evidence [that] has been admitted that I would have refused. . . . I can tell you that basically this man has 15 years of experience as a drug investigator. He has the experience, background, and training to give an expert opinion. So far, everything that's been asked of him falls within that experience and training.

The district court did not abuse its discretion in admitting either witness's testimony.

## D. Identification by Robert Red Shirt.

Robert Red Shirt is Blue Bird's grandson and cousin to Spotted Elk and Rusty and Marvella Richards. His former girlfriend was sister to Flint Thomas Red Feather. He testified pursuant to a grant of immunity. He said that when he was seventeen years old, he began selling cocaine for Blue Bird. He said he would typically get installments of eight bindles of cocaine, which he would sell for cash or trade goods, such as guns, jewelry and EBT cards. He also described an occasion when he and his girlfriend Tanya picked up fifteen ounces of cocaine from Blue Bird and took it to Red Feather's house, where they packaged it into smaller packets using a mirror and a digital scale.

After this testimony in which Red Shirt named the defendants and recounted his familial relationships with four of them and his drug-business relationship with two of them, the prosecutor asked him to identify the defendants. First, he was asked if he saw Geraldine Blue Bird, his grandmother, in the courtroom. Red Shirt did not respond. There was a prolonged episode in which the prosecutor tried to get Red Shirt to identify Blue Bird, then Spotted Elk, then Red Feather. Sometimes Red Shirt

-33-

contended that he had trouble seeing, but the prosecutor asked that he be declared a hostile witness because he was refusing to identify people he knew. The prosecutor asked Red Shirt if anyone had threatened him, and he answered "no." He walked into the well of the courtroom where the defendants sat, and with much coaxing, he eventually identified Red Feather, but still contended that he could not recognize his grandmother. The prosecutor reminded him of the terms of his immunity agreement, and the court excused Red Shirt temporarily and appointed a lawyer to advise him about the consequences for him of perjury.

Blue Bird moved for a mistrial, which the district court denied. The court found it incredible that Red Shirt was unable to identify his grandmother and cousins. In light of the identification of the defendants by multiple other witnesses, the court held that there was no doubt as to their identity and "[s]o I believe that the procedure that was used was proper under the circumstances . . . ." After a recess for Red Shirt to consult his lawyer, he was recalled to the stand and asked if he recognized the people in a photograph; he replied that he did recognize them and that one of them was Blue Bird. Other than that, he was not asked to identify Blue Bird in person after resuming the stand.

Blue Bird contends that the in-court identification was a line-up and that it was unduly suggestive. In support of her argument she cites United States v. Staples, 410 F.3d 484, 487 (8th Cir. 2005), and various other cases dealing with suggestive pre-trial photo arrays or show-ups that could taint a witness's ability to make a valid in-court identification. This case differs from those cases in important ways: Here, there was no pre-trial identification that would affect Red Shirt's ability to pick out Blue Bird, and more importantly, there was overwhelming evidence that Red Shirt knew Blue Bird--she was, after all, his grandmother as well as his drug-dealing boss. Moreover, far from identifying her because of unfair prosecutorial suggestion, he refused to identify her in person in court. Finally, upon retaking the stand after the recess, Red Shirt was given the photograph and asked who it portrayed. It contained three persons, only one of whom was a defendant at trial. He picked out Blue Bird with no

prompting. There was absolutely nothing that created a "very substantial likelihood of irreparable misidentification," Neil v. Biggers, 409 U.S. 188, 197 (1972), and thus there was no due process violation.

## VII. Sufficiency of the Evidence.
## A. Colin Spotted Elk.

In his opening brief, Spotted Elk argued that his conviction on Count VI, use of or carrying a firearm during and in relation to a drug trafficking crime, 18 U.S.C. § 924(c)(1)(A), should be reversed because he did not actively employ the gun in question, but only caused Thomas Spotted Bear to accept the gun in exchange for cocaine. After his opening brief was filed, the Supreme Court decided Watson v. United States, 128 S. Ct. 579 (2007), in which it held that receiving a gun in barter for drugs is not "use" of the gun in connection with the drug transaction. Spotted Elk argued in his reply brief that Watson required reversal of his conviction, and the government confessed reversible plain error in a letter to this court. The indictment in Count VI alleged that Spotted Elk "did use and carry a firearm" during and in relation to a drug trafficking crime, and the jury instructions stated, "You may find that a firearm was used during the commission of the crimes of conspiracy or distribution of a controlled substance if you find that it was brandished, displayed, fired, or traded or offered for trade." The instruction was misleading as it suggested that receiving as well as giving a gun in exchange for drugs would constitute "use." The evidence at trial supporting Count VI was that Spotted Elk had caused Spotted Bear to accept the gun as barter for cocaine; there was no evidence of use or carrying the gun in connection with a drug transaction. Accordingly, we reverse Spotted Elk's conviction on Count VI as inconsistent with Watson and remand for the district court to vacate the conviction and resentence on the remaining counts of conviction. See United States v. Kirk, 528 F.3d 1102, 1110 (8th Cir. 2008) (reversing for plain error section 924(c) conviction for "use" of firearm based on receiving gun in trade for drugs).

## B. Geraldine Blue Bird.

Blue Bird argues that there was insufficient evidence to support her conviction for Count IV, possession of cocaine with intent to distribute on September 17, 2005, when Officer Pamela Janis found the packet on the floor of the police station changing room, and Count VIII, for use of or carrying guns in connection with a drug trafficking crime on December 21, 2005, when police found three guns in the backpack in Room 133 of the Ramada Inn.

We review a claim of insufficient evidence in a criminal case to determine whether, viewing the evidence in the light most favorable to the government, there was substantial evidence that would fairly support the "'conclusion that every element of the crime has been established beyond a reasonable doubt.'" United States v. Crenshaw, 359 F.3d 977, 987 (8th Cir. 2004) (citing Glasser v. United States, 315 U.S. 60, 80 (1942), and quoting Jackson v. Virginia, 443 U.S. 307, 313-14 (1979)). We have little difficulty in concluding that the evidence on Counts IV and Count VIII satisfies that test.

There is abundant evidence that the cocaine bundle Officer Janis found on the floor of the police changing room on September 17, 2005, came from Blue Bird. Officer Whary testified that when he brought Blue Bird in for booking, he noticed that she was "aggressively" pushing something down in the front of her pants. He asked her about it and she said it was a feminine pad. Whary asked Officer Janis to strip search Blue Bird. Officer Janis also said that Blue Bird had kept pushing something toward her groin area during booking and said something about her menstrual cycle. When Janis took Blue Bird in the changing room to change into jail clothing, she noticed Blue Bird standing by a cart and moving it with her leg. Then, when Blue Bird had finished changing, Janis looked under the cart and found the duct-taped package that contained cocaine. Janis picked the package up and did not say anything about it, but Blue Bird responded by saying, "Can I talk to you? I need to talk to you. . . . This is all about my son." The package contained two bags, each of which in turn held eight

bindles of cocaine. Both the duct-tape wrapping and the baggies with eight bindles were established throughout the trial as the characteristic packaging of Blue Bird's organization.

The conclusion that the package of cocaine belonged to Blue Bird is supported by many factors: Blue Bird's behavior in pushing something down into her pants and lingering near the cart and moving it with her leg; Janis' discovery of the bundle immediately after Blue Bird changed clothes in the room; Blue Bird's apparent consciousness that the package incriminated her; and the packaging of the cocaine in the bundle, which was the same as the eight-pack packaging characteristic of the Blue Bird organization. These factors together easily constitute substantial evidence that would permit a jury to find Blue Bird possessed the package.

Count VIII was based on the carrying or use of the guns in the backpack found at the Ramada Inn.[5] Wenona Richards testified that the black backpack, Government's Exhibit 58, belonged to Blue Bird and that she habitually had guns, cocaine and money in the backpack. Jody Richards also identified the backpack as belonging to Blue Bird and said that Blue Bird usually carried her cocaine in the backpack. On December 21, 2005, Blue Bird and the three Richardses had left Blue Bird's house at 629 Indiana in Rapid City because police had picked up a youngster at the house earlier that day and Blue Bird had cocaine on hand that needed to be packaged. She therefore decreed that the group would go to the Ramada Inn to divide and package the cocaine. They traveled in a green van. Blue Bird gave Norton Richards the money to rent the rooms at the Ramada Inn, and Norton registered for Rooms 131 and 133. All four of them walked together from the van to the rooms. Norton carried Blue Bird's backpack and

---

[5]Although the instruction on Count VIII included the same language as the instruction on Count VI, which would allow a jury to find "use" of a gun accepted for trade, there was no evidence of a trade in connection with the guns at issue in Count VIII, and there was evidence of carrying of those guns. Therefore, any error in the jury instruction was harmless, see Neder v. United States, 527 U.S. 1, 17 (1999), and at any rate, Blue Bird does not complain of such an error.

left it in Room 133, the room Blue Bird was occupying. The backpack contained a kilo that Blue Bird had picked up at Eli Bald Eagle's, and Jody Richards said that the cocaine got from Bald Eagle's to the Ramada "[w]ith Geraldine" in the backpack. The group settled into the rooms, with Norton, Jody, and Wenona Richards smoking some marijuana. Later, Blue Bird gave them some cocaine and they went into the bathroom to smoke it while Blue Bird set to work dividing up the kilo with a razor in Room 133. When the police searched Room 133, they found the black backpack there lying next to the Tupperware containers.

The evidence supports the inference that Blue Bird caused the backpack containing the guns to be carried from 629 Indiana to the Ramada Inn, whether or not she personally carried them. Wenona Richards testified that Blue Bird brought the backpack to the Ramada Inn.[6] The group came to the Ramada Inn at her bidding in order to accomplish the business of the cocaine distribution conspiracy. Norton was taking orders from Blue Bird, including renting the room and by inference, toting her effects. Once at the rooms, the backpack was left with Blue Bird, who exerted dominion over the contents.

Blue Bird argues that she did not "carry" the guns because no one testified that she moved the backpack from one place to another and there was testimony that Norton brought the backpack from the van to the room. There can be no doubt that the backpack with the guns traveled in close proximity to Blue Bird from 629 Indiana to Room 133, part of the way in a van and part of the way by Norton Richards as he walked with Blue Bird from the van to her room, acting as her bellman. Moreover, the evidence supports the inference that Blue Bird caused it to be so transported. "Whoever willfully causes an act to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal."

_____

[6]Wenona Richards was asked:
Q: So what, if anything, did [Blue Bird] bring with her to the Ramada?
She answered:
A: That black backpack and that black bag right there.

18 U.S.C. § 2(b). Therefore, causing Norton to carry the bag instead of carrying it herself does not insulate Blue Bird from criminal liability. As for the van ride, "the generally accepted contemporary meaning of the word 'carry' includes the carrying of a firearm in a vehicle." Muscarello v. United States, 524 U.S. 125, 139 (1998) (internal quotation marks omitted). Thus, the van ride would satisfy the carrying element.

Substantial evidence supported Blue Bird's convictions on Counts IV and VIII.

## VIII. Sentencing Issues.

The sentences meted out in this case were long. Blue Bird was sentenced to 410 months in prison,[7] Marvella Richards to 235 months, Rusty Richards to 220 months, and Red Feather to 200 months.[8] All four remaining defendants contend that the district court erred in arriving at their sentences.

We review the district court's sentencing decisions under an abuse of discretion standard. Gall v. United States, 128 S. Ct. 586, 594 (2007). We must ensure that the district court committed neither a significant procedural error (such as basing the sentence on clearly erroneous facts or mistakenly treating the Sentencing Guidelines as mandatory), nor imposed a substantively unreasonable sentence. Id. at 597. We must give deference to the district court's balancing of the relevant sentencing factors under 18 U.S.C. § 3553(a). Id. A sentence within the Guidelines range is accorded a presumption of substantive reasonableness on appeal (though not, of course, in the district court). United States v. Robinson, 516 F.3d 716, 717-18 (8th Cir. 2008). We

[7]The actual sentence was 350 months on Count I, 60 months on Count II, and 240 months on Counts III, IV, and VII, all to be served concurrently, and 60 months on Count VIII to be served consecutively to the other counts.

[8]We do not consider Spotted Elk's sentence because he raises no sentencing arguments; we need not ascertain the effect on his sentence of the vacatur of the gun conviction, which will be determined in the district court.

review de novo the district court's interpretation and application of the Guidelines, and we review its findings of fact for clear error. United States v. Voegtlin, 437 F.3d 741, 747 (8th Cir.), cert. denied, 127 S. Ct. 368 (2006).

## A.  Geraldine Blue Bird.

Blue Bird argues that the district court based her sentence on clearly erroneous findings regarding the amount of drugs possessed by the conspiracy, that her sentence was unreasonable, and that the district court's reliance on the harm done by Blue Bird to the impoverished community in which she lived constituted an equal protection violation.

Blue Bird contends that the district court's finding that she was responsible for 16 kilograms, 14 ounces of cocaine is clearly erroneous because it was based on the testimony of unreliable, drug-addicted witnesses, because one witness testified to different amounts, and because in one instance, the district court misinterpreted testimony about a purported purchase of one kilo from a person named Red Fawn.

The district court found that Blue Bird had purchased nine kilograms of cocaine from Jean Merrival.  That finding was supported by Merrival's testimony that she supplied the group with ten kilograms of cocaine over the course of twelve to fourteen purchases, beginning with small amounts and working up to a kilogram at a time.  Blue Bird objects that Merrival gave statements to police in which she estimated the amount of cocaine she supplied Blue Bird at three to four kilograms and, in another statement, five to six kilograms.  Merrival explained that when she referred to "five to six kilograms transactions," she was referring only to transactions in which she sold an entire kilogram at once, not the earlier, smaller transactions.  The district court did not clearly err in accepting Merrival's trial testimony.

The district court further found that Blue Bird changed suppliers by going directly to Jean Merrival's supplier, Marisa Perez, and that Blue Bird bought a kilogram

a month from Perez from June 2005 to December 2005, resulting in an additional six kilograms. The court then found that Clarence Behan purchased an additional kilogram for the conspiracy from Red Fawn and fourteen ounces from Donny Ghost Bear. Blue Bird argues that Behan's testimony about Red Fawn indicates that Justin Hawk Wing tried to buy from her and was cheated out of his money. Even if the district court did misinterpret this testimony, the error was harmless because the district court based the offense level on fifteen kilograms, which is supported by the amounts purchased from Merrival and Perez without taking into account the amounts purchased by Behan from other suppliers. See United States v. Idriss, 436 F.3d 946, 951 (8th Cir. 2006) (error harmless when district court would have imposed same sentence without error).

Blue Bird also argues that the district court erred in taking into account that the conspiracy took poor people's EBT cards for cocaine. First, Blue Bird says there was no evidence she participated in accepting EBT cards, but this is patently false. Not only was there the circumstantial evidence of EBT cards in many different names found in Blue Bird's trailer on March 20, 2005, but there was direct evidence in the testimony of Jody Richards:

> Q: Did anyone related to this case indicate it was okay to take EBT cards for cocaine?
> A: Yes.
> Q: Who?
> A: Geraldine, Colin.
> . . . .
> Q: So people would come to you with EBT–other people come to you with EBT cards wanting cocaine?
> A: No, no, not a lot of people. Just like probably my cousin, or whoever.
> . . . .
> Q: Explain how your cousin will give you their EBT card.
> A: They'd ask me if I wanted to buy some EBT; then I ask Geraldine and Geraldine will say, "It's up to you," or if they don't burn you, or---.
> Q: What would you do then?

-41-

A: I'll trust them.

Q: In terms of what?

A: Giving them a half for the money.

Q: A half a gram of cocaine?

A: Yes.

The district court's finding that Blue Bird participated in taking EBT cards for cocaine is not clearly erroneous.

Second, Blue Bird contends that it is an equal protection violation to take into account at sentencing the fact that her victims were poor, since this penalizes her for living in an impoverished community, specifically, on an Indian reservation. Blue Bird's argument is a disparate impact argument, but "if a neutral law has a disproportionate adverse impact on a racial minority, it is unconstitutional only if that effect can be traced to a discriminatory purpose." United States v. Clary, 34 F.3d 709, 712 (8th Cir. 1994) (holding that disparate crack/powder cocaine penalties did not violate equal protection). Nothing in this record suggests a discriminatory purpose. Blue Bird was not penalized for living in an impoverished community, but for preying on it. Not only was Blue Bird pumping cocaine into a vulnerable community, but she was accepting her customers' welfare benefit cards, at a fraction of their cash value, in exchange for the cocaine that was ravaging the community--including its children, as her sentencing transcript showed. While she denied accepting EBT cards at her sentencing, she also condoned such conduct, saying, "[I]t's the person that has the EBT card [who] decide[s] whether they are going to take that and spend it on their children or whether they are going to take it and sell it for drinks or whatever. That, again, is their choice." The district court did not abuse its discretion in taking into account the harm that Blue Bird's offenses did to her community.

Next, Blue Bird argues that the district court conflated the analyses for a departure from the Guidelines versus a variance from the Guidelines. A departure occurs within the context of the Guidelines themselves, which prescribe that the sentencing court should depart from the Guidelines range in certain situations, as for

-42-

example, when important circumstances of a particular case are not adequately taken into account by the Guidelines. See generally USSG § 5K2.0. A variance, on the other hand, results from a separate analysis of whether "a non-Guidelines sentence would be more appropriate under the circumstances pursuant to § 3553(a)." United States v. Washington, 515 F.3d 861, 866 (8th Cir.), cert. denied, 128 S. Ct. 2493 (2008). We have urged the district courts to consider the departure and variance questions sequentially in order to facilitate appellate review. Id. In this case, the district court did distinguish between circumstances that would justify a departure and those that would justify a variance, but since some of the same factors were urged as relevant in both regards, occasionally the district court's discussion relates to both analyses at the same time. We see no evidence that the district court made any legal error in this regard.

Blue Bird further argues that the district court failed to consider factors relevant to fixing the proper sentence under § 3553, such as her past good works and her health. To the contrary, the district court did consider those factors. The district court considered Blue Bird's history of good works to have been substantially outweighed by her willingness to bring drugs into her community:

> Geraldine, I can tell you that one of the things that concerns me the most is that you were a woman who was well-respected and highly regarded on the Pine Ridge Indian Reservation. You were someone who had a past history of doing good works for others. You were a role model for many people; someone that people looked up to and you got involved in this drug conspiracy. . . . You need to both walk the walk and talk the talk, not just talk the talk. You talk about being involved in drug and alcohol treatment programs and trying to work for kids doing that. You brought in over 16 kilos of cocaine; that's over 32,000 sales of cocaine to the Pine Ridge Indian Reservation. . . . That is not an amount that helps the young children that live on that Pine Ridge Indian Reservation.

The court also specifically considered Blue Bird's health and concluded that her health condition would result in her being placed in a medical facility.

-43-

Finally, Blue Bird contends that the 410-month sentence is unreasonable. Giving due deference to the district court's decision, we cannot say that the district court "failed to consider a relevant factor, gave significant weight to an improper or irrelevant factor, or committed a clear error of judgment." Washington, 515 F.3d at 867. We see no abuse of discretion.

## B. Marvella Richards.

Marvella Richards argues that the district court erred in applying a two-level enhancement to her Sentencing Guidelines offense level for use of a minor to commit a crime. The district court found that it was reasonably foreseeable to Marvella Richards that other co-conspirators were using a certain child to sell drugs, to hold money, and to do other acts on behalf of the conspiracy. The district court further found that Marvella had directly sold drugs to that child. Later, the district judge explained that Blue Bird managed to elude detection by storing her drugs in places where they would not be found, such as at Marvella Richards' house, and by hiding the drugs with juveniles. Therefore, the court held that the two-level enhancement under USSG § 3B1.4 was applicable. Under United States v. Voegtlin, 437 F.3d 741, 747 (8th Cir. 2006), for the adjustment to apply, a defendant must affirmatively involve or incorporate the minor into the offense, but a conspirator is accountable for all reasonably foreseeable acts of a co-conspirator undertaken in furtherance of the jointly undertaken criminal activity. At the sentencing, there was evidence that Marvella had sold cocaine directly to the child, who had a customer waiting (although in fact the child duped the customer and used the cocaine himself). Moreover, Marvella Richards told Agent Dan Cooper that she knew the child was selling cocaine for Blue Bird. The district court did not err in applying section 3B1.4 to the facts of this case.

Marvella Richards further argues that the district court abused its discretion in weighing the relevant sentencing factors under 18 U.S.C. § 3553(a). The district judge carefully explained her reasoning for refusing to vary downward, including a lengthy discussion of how Marvella Richards' circumstances and sentencing range compared

with that of the other co-conspirators. While the district judge did not consider a downward variance appropriate, she did take the comparative sentences of other conspirators into account in choosing a sentence at the bottom of the Guidelines range. Moreover, it is clear that the court took into account Marvella Richards' accomplishments and struggle against adversity. The court addressed her at sentencing:

> Marvella, I can tell you that of the many defendants that I have sentenced in this case, your case is one of the harder ones for me and that is because you really have so much potential that you've shown in your life up to this point.

The transcript makes it clear that the district judge was fully cognizant of the poignant facts of Marvella Richards' case, and yet the court nevertheless concluded that a Guidelines range sentence was appropriate. We cannot say that the district judge, with her experience and command of this case, abused her discretion.

## C. Rusty Richards.

Rusty Richards contends that the district court erred in giving him a two-level reduction in offense level as a minor participant, rather than a four-level reduction as a minimal participant. The question of whether a defendant was a minor or minimal participant is a question of fact, reviewable for clear error. United States v. Ortiz, 236 F.3d 420, 422 (8th Cir. 2001). The application notes to the Mitigating Role guideline, USSG § 3B1.2, state that "the defendant's lack of knowledge or understanding of the scope and structure of the enterprise and of the activities of others is indicative of a role as minimal participant. It is intended that the downward adjustment for a minimal participant will be used infrequently." USSG § 3B1.2, comment. (n.4).

The district court found that Rusty Richards had participated in the conspiracy primarily by selling at the retail level, but that there was also evidence that he repackaged cocaine for sale once. These findings are supported by the record. The

evidence indicated that Rusty Richards was selling from the Igloos--he had an Igloos tattoo--so the idea that he was ignorant of the "scope and structure of the enterprise" is untenable. The district court did not clearly err in applying the minor participant rather than the minimal participant reduction.

### D. Flint Thomas Red Feather.

### (1)

Preliminarily, Flint Thomas Red Feather argues that the district court erred in denying his motion for access to the presentence investigation reports (PSRs) and sentencing transcripts of previously sentenced co-defendants, which he contends he needed in order to compare sentences to show disparity under 18 U.S.C. § 3553(a)(6). The district court denied his motion, finding that he had not made a showing that disclosure of the PSRs was "required to meet the ends of justice," that Red Feather had not timely requested the sentencing transcripts, and that publicly available documents would give Red Feather access to the information he needed to prepare for sentencing.

The district court's decision on whether to provide access to PSRs is reviewed for abuse of discretion. See United States v. McKnight, 771 F.2d 388, 391 (8th Cir. 1985). F. R. Crim. P. 32(c), which mandates the preparation of a PSR and the disclosure of the PSR to the defendant, does not treat the question of when the court should make a PSR available to a third party. It is generally agreed that "some showing of special need" is required before a district court should release a PSR to a third party. United States Dep't of Justice v. Julian, 486 U.S. 1, 12 (1988); United States v. Shyres, 898 F.2d 647, 656 (8th Cir. 1990); United States v. Gomez, 323 F.3d 1305, 1308-09 (11th Cir. 2003) (per curiam). The district court found that Red Feather did not show a special need because Red Feather could obtain the necessary information about co-conspirators' offense characteristics, criminal history, and sentences from publicly available sources. The justness of the district court's reasoning is demonstrated by the materials in the Clerk's Record and in Red Feather's motion to

supplement the record in this case,[9] which contain copies of the plea agreements, factual basis statements, and judgments for the many co-conspirators who pleaded guilty. These publicly available records show offense characteristics and the sentence imposed for the co-conspirators to whom Red Feather wishes to compare his sentence. Red Feather states in his brief that two of the co-conspirators to whom he wishes to compare himself testified at trial about their criminal histories. Furthermore, it is not unreasonable to require a third party desiring information about a defendant's sentencing proceedings to attend the sentencing hearings. See United States v. Corbitt, 879 F.2d 224, 240 & n.20 (7th Cir. 1989). Red Feather has not shown that the publicly available sources of information were inadequate for his purposes. The district court did not abuse its discretion in denying his motion.

As to the transcripts, the district court's ruling that Red Feather's motion was not timely was not an abuse of discretion.

(2)

Red Feather next argues that the district court committed a procedural sentencing error by basing his sentence on a clearly erroneous finding of fact as to the amount of drugs for which he should be accountable and in applying a presumption of reasonableness to the Sentencing Guidelines range.

---

[9]We grant Red Feather's motion to supplement the appellate record with the plea agreements, factual basis statements, and judgments for co-conspirators who were sentenced after his own sentence was handed down. These materials are arguably relevant to his § 3553(a) argument and the sentencing documents would not have been available at the time of Red Feather's sentencing. However, the materials relating to Janine Cottier, who was sentenced before Red Feather, do not fall within that category, and therefore the motion is denied with respect to those documents.

The district court found that Red Feather was accountable for just over sixteen kilograms[10] of cocaine, the same amount for which it held Blue Bird accountable (and which we held was not clearly erroneous, supra at 40). Red Feather also argued to the district court that he moved away from Pine Ridge and ceased active participation in the drug business at the end of 2004 or the beginning of 2005; therefore, he contended that he should not be accountable for the drugs peddled by the conspiracy after he had ceased participating in it. The government argued, and the district court held, that Red Feather had to prove that he had withdrawn from the conspiracy in the particular manner required by conspiracy law. To withdraw from a conspiracy at common law, a conspirator must show not only that he ceased activities in furtherance of the conspiracy, but also that he either made a "clean breast" to the government or else communicated the fact of withdrawal to his co-conspirators in a manner reasonably calculated to reach them. See United States v. Jackson, 345 F.3d 638, 648 (8th Cir. 2003).

The Guidelines include as relevant conduct in the case of a jointly undertaken criminal activity all (1) "reasonably foreseeable acts and omissions of others" (2) "in furtherance of" (3) "the jointly undertaken criminal activity." USSG § 1B1.3(a)(1)(B). These elements closely correspond to the classic statement of the common law requirements for substantive conspiracy liability. See Pinkerton v. United States, 328 U.S. 640, 647-48 (1946) ("A different case would arise if the substantive offense committed by one of the conspirators was not in fact done in furtherance of the conspiracy, did not fall within the scope of the unlawful project, or was merely a part of the ramifications of the plan which could not be reasonably foreseen as a necessary or natural consequence of the unlawful agreement.").

---

[10]There is a trivial discrepancy in the amounts, since the district court said "16 kilograms, 10 ounces," in Red Feather's case, but otherwise made it clear that she intended to hold Red Feather accountable for the same amount attributable to Blue Bird, which was 16 kilograms, 14 ounces.

But despite the Pinkertonian language of the guideline, the commentary to USSG § 1B1.3 explains that the concepts of relevant conduct under the Guidelines, on the one hand, and conspiracy liability, on the other, are not the same: "The principles and limits of sentencing accountability under this guideline are not always the same as the principles and limits of criminal liability. . . . [T]he focus [of the Guidelines] is on the specific acts and omissions for which the defendant is to be held accountable in determining the applicable guideline range, rather than on whether the defendant is criminally liable for an offense as a principal, accomplice, or conspirator." USSG § 1B1.3, comment. (n.1). This commentary was added in 1992, USSG App. C, Amendment 439, following criticism that "the relevant conduct section failed to adequately distinguish among conspirators and others involved in 'jointly undertaken activities.'"[11] Roger W. Haines, Jr., et al., Federal Sentencing Guidelines Handbook 133 n.19 (2007-08 ed.).

The commentary to § 1B1.3 shows that while the emphasis in substantive conspiracy liability is the scope of the entire conspiracy and foreseeability in light of that scope, the emphasis under § 1B1.3 is the scope of the individual defendant's undertaking and foreseeability in light of that undertaking, rather than the scope of the conspiracy as a whole: "Because a count may be worded broadly and include the conduct of many participants over a period of time, the scope of the criminal activity jointly undertaken by the defendant . . . is not necessarily the same as the scope of the entire conspiracy, and hence relevant conduct is not necessarily the same for every participant." USSG § 1B1.3, comment. (n.2). This distinction between the scope of the entire conspiracy, for which a defendant may be held accountable under Pinkerton, and the scope of the individual defendant's undertaking, for which a defendant may be held accountable under § 1B1.3, was highlighted as a "key point" in a law review article

---

[11]Because the November 1992 amendment clarified that relevant conduct was narrower than Pinkerton liability, cases discussing relevant conduct in conspiracy cases before the amendment must be viewed with caution, see, e.g., United States v. Granados, 962 F.2d 767, 771 (8th Cir. 1992) (stating in discussing relevant conduct, "[A] party to a conspiracy takes the conspiracy as he finds it.").

written by the Chairman and General Counsel of the Sentencing Commission in 1990. William W. Wilkins, Jr. and John R. Steer, <u>Relevant Conduct: The Cornerstone of the Federal Sentencing Guidelines</u>, 41 S.C.L. Rev. 495, 510 (1990). <u>See generally</u> <u>United States v. McClatchey</u>, 316 F.3d 1122, 1127-29 (10th Cir. 2003) (conviction of conspiracy does not make defendant responsible under § 1B1.3 for all reasonably foreseeable bribes paid by his co-conspirators; the bribes must also fall within the scope of the defendant's joint undertaking); <u>United States v. Soto-Piedra</u>, 525 F.3d 527, 531-33 (7th Cir.) ("Conspiracy liability . . . is generally much broader than jointly undertaken criminal activity under section 1B1.3. . . . Actions of coconspirators that a particular defendant does not assist or agree to promote are generally not within the scope of that defendant's jointly undertaken activity."), <u>cert. denied</u>, 129 S. Ct. 261 (2008); <u>United States v. Swiney</u>, 203 F.3d 397, 404 (6th Cir. 2000) ("[T]he Sentencing Guidelines have modified the <u>Pinkerton</u> theory of liability so as to harmonize it with the Guidelines' goal of sentencing a defendant according to the 'seriousness of the actual conduct of the defendant and his accomplices.'") (quoting Wilkins & Steer, <u>supra</u>) (distinguished in <u>United States v. McIntosh</u>, 236 F.3d 968, 974 (8th Cir. 2001)); <u>United States v. Lanni</u>, 970 F.2d 1092, 1093 (2d Cir. 1992) ("[A]n important distinction exists between the criminal law standard for convicting a defendant of conspiracy and the Guidelines standard for sentencing a defendant convicted of conspiracy."). <u>But see</u> <u>United States v. Lucht</u>, 18 F.3d 541, 554 (8th Cir. 1994) (when defendant is convicted of <u>substantive</u> offense based on <u>Pinkerton</u> liability, he may be sentenced on the basis of aggregate amount of drugs involved in each count of conviction, based on jury's findings).

As we have applied § 1B1.3 in the specific context of a drug distribution conspiracy, a defendant's conviction for conspiracy does not automatically mean that every conspirator has foreseen the total quantity of drugs involved in the entire conspiracy; in addition to membership in the conspiracy, the district court must find the scope of the individual defendant's commitment to the conspiracy and the foreseeability of particular drug sale amounts from the individual defendant's vantage

point.[12] United States v. Weekly, 118 F.3d 576, 578-80 (8th Cir.), modified on other grounds, 128 F.3d 1198 (8th Cir. 1997); United States v. Flores, 73 F.3d 826, 834 (8th Cir. 1996). We recently reversed a sentence in part because of the district court's blanket assertion that the defendant was responsible for actions of other conspirators that were a part of the conspiracy, unqualified by an analysis of whether the actions were foreseeable to the defendant. United States v. Delgado-Paz, 506 F.3d 652, 655 (8th Cir. 2007); accord United States v. Rogers, 982 F.2d 1241, 1245-46 (8th Cir. 1993) (remanding for findings regarding whether entire amount of drugs attributable to conspiracy were foreseeable to defendant); United States v. Anderson, 243 F.3d 478, 484 (8th Cir. 2001) (district court erred in attributing co-conspirator's drug sales to defendant without any evidence connecting the defendant to the drugs). Conversely, we recently affirmed a case in which two conspirators were held accountable for different amounts of drugs, based on different degrees of involvement in the conspiracy's activities. United States v. Pruneda, 518 F.3d 597, 607 (8th Cir. 2008).

---

[12]In United States v. Foxx, 544 F.3d 943 (8th Cir. 2008), this court considered the argument of a co-conspirator that he was not subject to the mandatory minimum sentence contained in 21 U.S.C. § 841(b) because he should not be held responsible for drug quantities of co-conspirators before he became involved in the conspiracy. We noted that, for § 841(b) purposes, a defendant is accountable for drugs possessed by his co-conspirators if they acted in furtherance of the conspiracy and their activities were known or reasonably foreseeable to the defendant. Id. at 953. The jury had been instructed that "each defendant was responsible for the quantity they themselves possessed, distributed, or agreed to distribute, and also for the quantity fellow conspirators distributed or agreed to distribute if those distributions or agreements 'were a necessary or natural consequence of the agreement or understanding and were reasonably foreseeable by the defendant." Id. at 951 (emphasis added). Thus, the jury's verdict provided the particularized finding of reasonable foreseeability that we require. We distinguished the §841(b) analysis from the determination of relevant conduct under USSG § 1B1.3. Id. at 953; see also id. at 954-55 (Arnold, J., dissenting).

-51-

Factors bearing on the scope of the defendant's criminal undertaking and the foreseeability of particular criminal acts include: (1) whether and to what extent the defendant benefitted from his co-conspirators' criminal acts, and (2) whether the defendant showed a substantial level of commitment to the conspiracy. United States v. Alexander, 408 F.3d 1003, 1010 (8th Cir. 2005); Weekly, 118 F.3d at 578.

The commentary to § 1B1.3 expressly states that conduct of the other conspirators that occurred before the defendant joined the conspiracy is ordinarily not "relevant conduct," comment. (n.2), and we have reasoned from this exclusion "that a person should also not be held responsible for the losses that occur after he exits the conspiracy." United States v. Oseby, 148 F.3d 1016, 1026 (8th Cir. 1998).

Even though the scope of substantive liability for conspiracy and relevant conduct are not co-extensive, the government contends that the common-law test for withdrawal from a conspiracy should be determinative of relevant conduct under § 1B1.3. Two of the cases the government cites, United States v. Maggard, 156 F.3d 843, 851 (8th Cir. 1998), and United States v. Zimmer, 299 F.3d 710, 718 (8th Cir. 2002), do not examine the claim of withdrawal in the context of determining "relevant conduct," but instead are interpreting the common law of conspiracy in order to determine whether the defendant was still legally a member of the conspiracy at a certain time.[13] See also United States v. Granados, 962 F.2d 767, 773 (8th Cir. 1992)

_____

[13]In Zimmer, the discussion of withdrawal occurred in the context of deciding how long Zimmer was a member of the conspiracy in order to tell which version of the Guidelines should apply. 299 F.3d at 718-19. The stringent common-law withdrawal test was somewhat beside the point, for we held that Zimmer was in fact actively participating in the conspiracy during the time he claimed to have withdrawn. See also United States v. Perez-Guerrero, 334 F.3d 778, 782-83 (8th Cir. 2003) (rejecting withdrawal argument in § 1B1.3 context because the defendant was still actively directing the operation of the conspiracy). Later in the Zimmer opinion, we held that Zimmer could be held accountable under § 1B1.3 for all the drugs attributable to the entire conspiracy; we based this conclusion on our reasoning that the entire drug quantity was foreseeable to Zimmer, rather than on the common law

(same) (decided before 1992 amendments clarifying § 1B1.3). The other case the government relies on, <u>United States v. Jackson</u>, 345 F.3d 638, 648 (8th Cir. 2003), discusses the common-law withdrawal test in the context of deciding whether the defendant was entitled to a jury instruction on withdrawal, not in determining relevant conduct for sentencing. However, other circuits have used the common-law withdrawal-from-conspiracy test in determining the scope of relevant conduct under § 1B1.3. <u>See</u> <u>United States v. Nieves</u>, 322 F.3d 51, 55 (1st Cir. 2003); <u>United States v. Thomas</u>, 114 F.3d 228, 267-68 (D.C. Cir. 1997); <u>United States v. Schorovsky</u>, 202 F.3d 727, 729 (5th Cir. 2000) (defendant withdrew). Under this test, a defendant who claims to have withdrawn from the conspiracy has the burden of proving an affirmative act of withdrawal, abandonment, or defeat of the conspiratorial purpose. <u>Schorovsky</u>, 202 F.3d at 729; <u>accord</u> <u>Nieves</u>, 322 F.3d at 55; <u>see generally</u> <u>Pinkerton</u>, 328 U.S. at 646-47. The affirmative act required is typically either a confession of the conspiracy to the government or else communication of the fact of withdrawal to the other conspirators; mere cessation of unlawful participation is not enough. <u>Maggard</u>, 156 F.3d at 851.

There is some tension between the policy expressed in the commentary to § 1B1.3 of tailoring the scope of relevant conduct to each particular defendant's undertaking versus the common-law withdrawal test, under which, once the defendant has climbed on board the conspiracy, liability for reasonably foreseeable acts in furtherance of and within the scope of the conspiracy accrues automatically unless the defendant can show rather dramatic and unusual facts showing affirmative renunciation of the conspiracy. It could be questioned whether the common-law withdrawal from conspiracy test is entirely consistent with § 1B1.3. In particular, a defendant's voluntary and permanent absence from the conspiracy's operations would seem to lead to findings that his commitment to the conspiracy and his likelihood of benefitting

---

withdrawal-from-conspiracy rule. 299 F.3d at 720-21. Similarly, in <u>Maggard</u>, 156 F.3d at 852, we held the defendant responsible for the entire conspiracy amount only after deciding that the entire amount was in furtherance of jointly undertaken criminal activity and was foreseeable to him.

from the conspiracy's activities were curtailed. However, even assuming that there is a place for the common-law test in applying § 1B1.3, it is nevertheless true that the test does not apply in cases where the conspiracy's activities expanded or changed in a way not foreseeable to the defendant at the time he discontinued his participation. In United States v. Ladum, 141 F.3d 1328, 1346 (9th Cir. 1998), the defendant, Ford, participated in a business that was illegally avoiding paying taxes for three years, quit for three years, and then began again. The court held that Ford should not automatically be liable for the tax loss during his three-year hiatus even though he did not affirmatively withdraw during those years because it was not "self evident to [the Ninth Circuit] that it was foreseeable to Ford that tax loss from the stores that were in operation in 1986 would continue to 1989, or that there would be tax loss from stores that had not been established in November 1986." Id. at 1347. The Ninth Circuit remanded for foreseeability findings. Id. Similarly, in United States v. Melton, 131 F.3d 1400, 1403-07 (10th Cir. 1997), the district court erred in basing a conspirator's sentence on new developments that occurred after the defendant had been arrested and had ceased participating in the criminal activity. Even though in these cases, the defendant did not withdraw by confessing or announcing his withdrawal to the other conspirators, his co-conspirators' new projects, undertaken in the defendant's absence, were not foreseeable to him and thus not relevant to his sentence.[14] In contrast, in United States v. Melvin, 91 F.3d 1218, 1226 (9th Cir. 1996), a defendant was liable for losses that occurred after he was fired from an illegally run business; because he had created the schemes that others continued to operate after he left, the losses were foreseeable and within the

---

[14]Another case in which cessation of activities halted the accrual of liability under § 1B1.3 is United States v. Morrow, 177 F.3d 272 (5th Cir. 1999) (per curiam), in which defendants who had joined a conspiracy and had not affirmatively withdrawn were nevertheless not accountable under § 1B1.3 for the actions of their co-conspirator-employers during the time the defendant was not employed. The Fifth Circuit held that the defendants' participation in the conspiracy could only take place while they were employed in the illegally run business, and so the court vacated several sentences based on losses accruing after the termination of their employment, while the conspiracy continued unabated. 177 F.3d at 303.

scope of his contribution to the conspiracy, even though he was no longer actively engaged in the business.

Thus, initially the district court must make the required findings that the actions of others were within the scope of the joint activity undertaken by the defendant, rather than the scope of the conspiracy as a whole; that the acts were in furtherance of that activity; and that they were known to or reasonably foreseeable by the defendant. Only if all these elements are satisfied will the defendant continue to be liable unless and until he withdraws from the conspiracy in accordance with the common-law rule.

Our research reveals one case antedating the 1992 amendments to § 1B1.3, United States v. Olderbak, 961 F.2d 756 (8th Cir. 1992), in which a conspirator moved away to California during the operation of a drug distribution conspiracy. Even though Olderbak was decided before the 1992 clarifying amendment, its result is consistent with the amendment. The defendant was sentenced on the basis of two drug-buying trips that happened after he moved away but that were merely continuations of the pattern he had participated in; however, he was sentenced only for the amounts that were consistent with those pre-existing patterns, not for the actual amounts of drugs traded (which apparently varied from the pattern established while the defendant was actively participating in the conspiracy). Id. at 763-64.

We review the district court's findings as to scope of the defendant's undertaking, foreseeability to the defendant, and furtherance of the conspiracy for clear error, see United States v. Mickle, 464 F.3d 804, 808 (8th Cir. 2006), but the question here is the district court's application of the Guidelines, which we review de novo, Voegtlin, 437 F.3d at 747.

In this case, at the government's urging, the district court applied the common-law withdrawal-from-conspiracy test, stating that the burden was on Red Feather to demonstrate his withdrawal from the conspiracy by making a clean breast to the authorities or communicating his withdrawal to his co-conspirators. The court stated,

-55-

"Here the only thing the defendant can point to is that he ceased activities, but that is not enough." The district court held Red Feather accountable for the same amount of drugs for which Blue Bird herself was accountable. The district court made no findings regarding foreseeability of the drug amount to Red Feather, apparently because the court believed that the common-law withdrawal test replaced the foreseeability requirement of § 1B1.3. This was legal error.

Moreover, on the record before us, this legal error was not harmless. See Fed. R. Crim. P. 52(a) (error that does not affect substantial rights must be disregarded); United States v. Craiglow, 432 F.3d 816, 819 (8th Cir. 2005) (to show error was harmless, government must show that there is no grave doubt as to whether error substantially influenced the outcome of the proceedings). If, as Red Feather argues, his participation ended in late 2004, the facts of this case could plausibly support a finding either way on the foreseeability issue. The evidence at trial indicated that Red Feather had been involved in selling and packaging cocaine for Blue Bird in the early days of the conspiracy. The conspiracy was organized with Blue Bird at the head, with the second in command being a series of three women, each of whom in turn became Blue Bird's closest associate: Dawnee Frogg, Janine Cottier, and finally Jody Richards. Jody Richards was introduced into the conspiracy by Red Feather while she was Red Feather's girlfriend, from 2001-04, and it was apparently after their relationship ended that she became Blue Bird's second in command. Jody Richards testified at trial that Red Feather had ceased participating in the conspiracy a long time before it came to an end:

> Q. In fact, even you admit that it had been a long time since Tom Red Feather had been involved in anything, hadn't it?
> A: Yes.
> ...
> Q. He had moved out of Pine Ridge, hadn't he?
> A. Yes.
> Q. Where did he move to?
> A. Oglala.
> Q. Who was he with?
> A. Donna Good Shot.

-56-

Jody Richards also admitted that she had testified before the grand jury that Red Feather was not really involved:

Q. Do you remember being asked what is his role in the organization? Do you remember being asked that?
A: Yes.
Q: Do you remember saying, "Nothing, really."
A: Yes, because we were--.
. . .
Q. And then you were asked, "Does he sell," weren't you?
A. Yes.
Q. And your response was no, wasn't it?
A. Yes.
Q. And then you were asked, "Does he buy from Colin or Geraldine," weren't you?
A. Yes.
Q. And your response was no, wasn't it?
A: Yes.
Q. As a matter of fact, you said, "No, his girlfriend don't let him do it," wasn't it?
A. Yes.
Q. Who was his girlfriend? Who is his girlfriend?
A. Donna Good Shot.

In calculating the drug amounts attributable to the conspiracy, the district court found that the conspiracy had bought one kilo a month from Marisa Perez from June 2005 to December 2005, and before that had bought nine kilos from Jean Merrival in 12-14 purchases, extending backward from May 2005. However, importantly, Jean Merrival testified that the early purchases from her were not kilos, but rather were smaller amounts, which totaled a kilogram over four to six purchases. Elsewhere, she estimated that she had handled five to six kilogram-size transactions with the group, implying that the rest of the ten kilogram total had consisted of small transactions. Other testimony is difficult to reconcile: Jody Richards testified that as far as she knew, the kilogram transactions started in February 2005, but significantly, this was before she had begun her close relationship with Blue Bird and had ascended to the top of the command structure, so it is plausible that she might not know the true extent of the conspiracy's business at that time. Clarence Behan testified that the kilogram

purchases began in late 2003.  Thus, the evidence is mixed, but if Red Feather were found to have ceased participating in the conspiracy in 2004, the district court could well find that the conspiracy began dealing in larger amounts after he left town, and accordingly, that the amounts the conspiracy ultimately traded were beyond what Red Feather would have had reason to expect.

The government argues that the evidence compels the conclusion that Red Feather continued to participate in the conspiracy until the end because at the sentencing hearing Agent Dan Cooper said that Wenona Richards told him that Geraldine Blue Bird asked Red Feather to go to the Ramada Inn after her arrest to retrieve a kilo of cocaine that the police failed to find in the room.  Cooper then said that Wenona indicated that yet another person, Billie American Horse, had passed the message to Red Feather and that Red Feather "indicated he knew what he was supposed to do."  This multiple hearsay is a rather thin reed on which to hang a finding of continued participation in the conspiracy because it does not indicate that Red Feather did anything or agreed to do anything--only that he knew what Blue Bird wanted him to do.  In any case, the district court did not make a finding as to the credibility or import of this testimony, and this testimony does not compel the conclusion that Red Feather was actively involved in the conspiracy in December 2005.

Because the district court's findings regarding the amount of drugs for which Red Feather is responsible at sentencing were based on a legally erroneous interpretation of § 1B1.3 and because the evidence could well have supported a different finding had the district court applied the correct rule, we must remand for resentencing.

(3)

Red Feather argues that the district court committed a substantive error in balancing the relevant sentencing factors under § 3553(a), by sentencing him to a term that was unjustifiably greater than the sentences of other co-conspirators who committed similar crimes.  For instance, Jody Richards, who was the second in command of the conspiracy, obtained a stipulation from the government that she was responsible for less than 2 kilograms of cocaine, and received a sentence of 70 months' imprisonment, with a possibility of a substantial assistance reduction.  Red Feather received a 200-month sentence.  Although Red Feather's sentence may change on

remand, we consider this point because it is more efficient to identify promptly any errors in the district court's sentencing methods.

In our circuit, a sentence that falls within the advisory sentencing range is presumptively reasonable on appeal.[15] United States v. Crumley, 528 F.3d 1053, 1069 (8th Cir. 2008). While 18 U.S.C. § 3553(a)(6) does require the sentencing court to consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," see United States v. Lazenby, 439 F.3d 928, 932-34 (8th Cir. 2006) (reversing where co-defendants' sentences were unwarrantedly disparate), the district court in this case did consider how Red Feather's sentence compared to his co-conspirators'. In particular, the court held that the lower drug quantity amount attributed to Jody Richards was the result of a use immunity agreement the government gave Jody Richards in order to discover the evidence that it then used against the other defendants, including Red Feather. Our substantive review of the district court's balancing of the § 3553(a) factors is deferential. Gall v. United States, 128 S. Ct. 586, 597-98 (2007). When one defendant cooperates and another does not, their situations, and hence their sentences, can properly be held to differ. See Crumley, 528 F.3d at 1068. Red Feather has not shown any abuse of discretion in the district court's § 3553(a) balancing.

(4)

Finally, Red Feather contends that the district court violated his Fifth Amendment right to silence by basing its choice of a sentence within the Guidelines range on Red Feather's failure to accept responsibility. We have held that denial of the Guidelines' downward adjustment for acceptance of responsibility, § 3E1.1, does not violate the defendant's right to silence. United States v. McQuay, 7 F.3d 800, 802-03 (8th Cir. 1993). "The constitutional argument is no more persuasive" in the context of the sentencing court's selection of a sentence within the sentencing range. United States v. Cruzado-Laureano, 527 F.3d 231, 237 (1st Cir. 2008).

---

[15]Red Feather lodged with the court a letter under F. R. App. P. 28(j), arguing that the district court had presumed the reasonableness of the Guidelines range in his case and had required extraordinary facts as a prerequisite to varying from the Guidelines range. The transcript shows that the district court distinguished between a departure and a variance, and that it understood and applied those concepts correctly.

## IX. Conclusion.

In sum, we reverse Spotted Elk's conviction under Count VI, and we remand for the district court to enter an acquittal and to resentence Spotted Elk on the remaining counts. We remand Red Feather's sentence for findings regarding the scope of Red Feather's joint undertaking and the foreseeability to Red Feather of the drug transactions engaged in by the co-conspirators. In all other respects, we affirm the convictions and sentences imposed by the district court, which we commend for its capable handling of this difficult case.

_____